**Renee DAVIS**

v.

**COLONIAL SECURITIES CORP., et al.**

**Civ. A. No. 80–1186.**

United States District Court,
E. D. Pennsylvania.

May 27, 1982.

Irv Ackelsberg, Community Legal Services, Philadelphia, Pa., for plaintiff.

James O. Hausch, Philadelphia, Pa., for defendants.

MEMORANDUM

GILES, District Judge.

This action arises under the federal Truth-in-Lending Act, 15 U.S.C. §§ 1601–1693 (1976) and (Supp. IV 1981) ("the Act") and the regulations promulgated under it by the Board of Governors of the Federal Reserve System, Regulation Z, 12 C.F.R. §§ 226.1–.15. Jurisdiction is properly asserted under section 130(e) of the Act, 15 U.S.C. § 1640(e) (Supp. IV 1981).

The parties have filed cross motions for summary judgment and have agreed that the sole issue to be decided is whether a transaction entered into between the parties on April 1, 1979, was a "credit-sale" within the meaning of the Act. In deciding these cross-motions for summary judgment I must determine whether there exists a disputed issue of material fact and whether judgment as a matter of law is appropriate. Fed.R.Civ.Pro. 56(c). Applying these standards to the undisputed facts as set forth below, I find that the transaction is a credit sale within the meaning of the Act and is therefore subject to the disclosure requirements of the Truth-in-Lending Act. Accordingly, I grant plaintiff's motion for summary judgment.

The parties have stipulated to the following facts. Defendant Colonial Securities Corp. ("Colonial") is a Pennsylvania-registered corporation whose president and sole stockholder is defendant Milton E. Selig.[1] Colonial purchased through bulk sales over 100 homes from the Department of Housing and Urban Development ("HUD"), including the house leased by plaintiff.

On April 1, 1979, Selig executed a written agreement on behalf of Colonial with Davis for the lease of a house at 3819 North Delhi Street, Philadelphia, Pennsylvania.[2] The agreement was prepared on a pre-printed lease form and provided for a monthly rental of $150.00. The lease further provided that it was for a one month period, and could be terminated by either party on ten days notice. Absent notice, the lease would continue on a month-to-month basis. In addition, the lease contained the following typewritten paragraphs:

12. In consideration of the reduced rental, lessee agrees to make any and all repairs at his own cost and expenses and to comply with all city notices.

13. If lessee pays the rent promptly on the due date, make [sic] all repairs at his own expense and pays all taxes, water and sewer rent and insurance, plus interest on the unpaid balances at the rate of 11¾% on unpaid balances [sic], he shall receive a deed to the premises at the expiration of 10 years upon payment of the sum of $1.00.

Defendants admittedly never provided plaintiff with the disclosures prescribed by the Act and Regulation Z. Defendants contend, however, that the transaction was a lease and that they had no federal disclosure obligations. Plaintiffs contend that despite defendants' use of lease terminology, the transaction was in essence a "credit sale" as defined in 15 U.S.C. § 1602(g) (1976) so that plaintiff should have received the required disclosures, such as the cash price of the sale and the amount of the finance charge. See 12 C.F.R. § 226.8(b) and (c).

Title 15 U.S.C. § 1602(g) (1976) provides:[3]

The term "credit sale" refers to any sale with respect to which credit is extended or arranged by the seller. The term includes any contract in the form of

---

1. Defendant Finkelstein has been dismissed from the case upon agreement of counsel.

2. The parties stipulated in their joint pretrial order that Selig executed the lease on behalf of Colonial. Defendants have subsequently submitted an affidavit by Selig that he did not sign as agent for Colonial. However, under E.D.Pa. Local R.Civ.Pro. 21(d)(2)(a), I find the parties' stipulation to be binding on defendants.

3. This section was in effect at the time of the transaction. It has subsequently been amended, see 15 U.S.C. 1602(g) (Supp. IV 1981), as have many other sections of the Act. References to the Act throughout this opinion are to the 1976 version of the Act, unless otherwise specified.

a bailment *or lease if the bailee or lessee contracts to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the property and services involved and it is agreed that the bailee or lessee will become, or for no other or a nominal consideration has the option to become, the owner of the property upon full compliance with his obligations under the contract.*

(Emphasis supplied.)[4]

Defendant argues that the lease in this case does not fit within the above definition. Since both parties had the right to terminate the agreement upon 10 days notice the sole obligation of plaintiff under the agreement was to pay $150.00 per month, plus taxes, water and sewer rent, and insurance—hardly a sum substantially equivalent to, or in excess of, the aggregate value of the property within the meaning of section 1602(g).

In support of this argument, defendant cites an unofficial letter issued by the Federal Reserve Board ("FRB") which concludes that rental agreements, terminable at any time by the consumer, are not credit sales within the meaning of the Truth-in-Lending Act, since they do not require payment of a sum equal to, or in excess of, the aggregate value of the property. FRB Letter No. 750, CCH Consumer Credit Guide ¶ 31,069. *See also* FRB Letter No. 761, CCH Consumer Credit Guide ¶ 31,083; FRB Letter No. 1192, CCH Consumer Credit Guide ¶ 31,623.[5]

Several courts have reached the same conclusion, in cases involving terminable rental agreements to purchase television sets with an option to purchase. *See, e.g., Lemay v. Stroman's Inc.*, 510 F.Supp. 921 (E.D.Ark.1981); *Clark v. Rent-It Corp.*, 511 F.Supp. 796 (S.D.Iowa 1981); *Dodson v. Remco Enterprises, Inc.*, 504 F.Supp. 540 (E.D.Va.1980); *Stewart v. Remco Enterprises, Inc.*, 487 F.Supp. 361 (D.Neb.1980); *Smith v. ABC Rental Systems of New Orleans, Inc.*, 491 F.Supp. 127 (E.D.La.1978), *aff'd mem.* 618 F.2d 397 (5th Cir. 1980). In these cases, courts have relied upon the termination provision present in the rental agreement to conclude that the definition of "credit sale" is not met since the consumer is obligated to pay only a weekly or monthly rental fee—not the aggregate value of the property or its substantial equivalent.

However, there is authority to the contrary. Some courts have declined to follow the conclusion of the FRB staff opinion letters and have held that a rental agreement can be a "credit sale" within the meaning of section 1602(g), even though the consumer has an option to terminate. *See Burks v. Curtis Mathes Centers, Inc.*, Civil Action No. 4–79–429 (D.Minn. November 14, 1980); *Jones v. Action T.V. Rental, Inc.*, Civil Action No. 79–1535 (E.D.Pa. June 30,

---

**4.** An identical definition of credit sale is contained in Regulation Z, 12 C.F.R. § 226.2(t). Neither the Act nor the regulations distinguish between purchases of real and personal property. Although there are some differences in the particular disclosures required in the credit sale of real property, *see* 15 U.S.C. § 1638(a)(6), there is no doubt that sales of residential real estate are subject to Truth-in-Lending disclosure requirements. *See, e.g., Conrad v. Marder*, Civil Action No. 78–1949 (E.D.Pa. October 16, 1975).

**5.** Defendant also cites two cases which I find inapposite. *Gerlach v. Allstate Ins. Co.*, 338 F.Supp. 642 (S.D.Fla.1972) held that an automobile insurance contract payable in installments is not "credit" under the Act. However, an insurance contract is clearly distinguishable from a real estate lease-purchase agreement. Whereas in the latter case the consumer is building up equity over time, the former is not really an installment purchase at all. As the *Gerlach* opinion points out, the installment purchaser of insurance is simply buying coverage for as long as he pays. At the conclusion of the contract, the insured does not become the owner of anything.

Defendants cite *Munson v. Orrin E. Thompson Homes, Inc.*, 395 F.Supp. 152 (D.Minn. 1974), for the principle that there must be "an underlying debt and obligation to make full and complete payment" in order for a contract to be "credit." The facts in *Munson* involve a surcharge within an electric rate structure payable either in installments or at once, which the court held was not a "credit sale." Since Congress expressly excluded rate tariffs from coverage, 15 U.S.C. § 1603(4), this holding is neither surprising, nor apposite to the case at bar.

1980); *Waldron v. Best T.V. and Stereo Rentals, Inc.*, 485 F.Supp. 718 (D.Md.1979); *Johnson v. McNamara*, Civil Action No. H–78–238 (D.Conn. April 12, 1979).

I find the latter view more persuasive. Those cases which decline to recognize a terminable rental agreement as a credit sale do not consider the practical consequences of entering such an agreement. Rather, they rely upon the unofficial opinion of the Federal Reserve Board and a literal reading of the statutory language.

■ Unofficial opinions of the Federal Reserve Board are not necessarily binding upon the courts. *Thomas v. Myers-Dickson Furniture Co.*, 479 F.2d 740, 747 (5th Cir. 1973). The court may, of course, defer to the Board's analysis, particularly in complex matters within the Board's expertise. However, I do not find this to be such a matter. The Board's position narrowly defines the term credit sale and does not recognize that the Act should be construed liberally to effectuate the underlying congressional purpose of benefiting the consumer by eliminating unscrupulous and predatory credit practices. *Johnson v. McCrackin-Sturman Ford, Inc.*, 527 F.2d 257, 262 (3d Cir. 1975).

The legislative history of section 1602(g) reveals a Congressional design to distinguish between "true leases" which are not covered and those leases which are in essence disguised sales arrangements. The legislative history of the Act includes the statement:

> The definition of credit sale is also limited to include leases only if they are, in essence, disguised sale arrangements. The language covering disguised leases is nearly identical to the language used in the Uniform Conditional Sales Act and in many state retail installment sales acts to distinguish between "true leases" and other leases.

H.R. Report No. 1040, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Ad.News 1960, 1980.

■ Thus, I find that the use of lease terminology in a particular transaction does not itself put the matter outside the coverage of the Act. On the contrary, a court must disregard form for substance and should analyze the economic substance of the transaction to determine whether it is truly a lease or is actually a disguised sale arrangement.[6]

I have found no cases construing 15 U.S.C. § 1602(g) to cover residential leases. However, in the most closely analogous cases, those construing consumer television leases containing similar provisions, courts have looked to the economic realities of the situation, holding such leases to be credit sales subject to truth-in-lending disclosure requirements. *Jones v. Action TV Rental, Inc.*, Civil Action No. 79–1535 (E.D.Pa. June 30, 1980); *Waldron v. Best T.V. and Stereo Rentals, Inc.*, 485 F.Supp. 718 (D.Md.1979); *Johnson v. McNamara*, Civil Action No. H–78–238 (D.Conn. April 13, 1979). For example, in *Jones v. Action T.V. Rental, Inc.*, the "lease" provided that if the lessee paid a certain number of weekly or monthly rentals totalling more than the purchase price, title would automatically pass. The agreement also provided that the renter was required to rent the equipment for only one week or month. The court impliedly rejected defendants' argument that the right to terminate the agreement placed the agreement beyond the scope of section 1602(g). Noting plaintiff's argument that the purchase option effectively forced the renter to choose between paying the entire sum or forfeiting all equity in the television, the court denied defendant's motion to dismiss, stating that discovery could produce evidence that the lease was actually a disguised sales agreement.

In drawing a distinction between disguised sales and true leases, it is also appro-

---

**6.** For years state laws have discerned the need to include certain leases within the scope of installment sales regulation where the economic reality underlying a transaction's form is that of a sale rather than a true lease. *See, e.g.*, 69 Pa.Stat.Ann. §§ 602(b), 603(10) (Purdon, 1965) (Pa. Motor Vehicle Sales Finance Act); 69 Pa. Stat.Ann. § 1201(6) (Purdon Supp. 1981–82) (Pa. Goods and Services Installment Sales Act); 13 Pa.Cons.Stat.Ann. § 1201 (Purdon Supp. 1981) (Uniform Commercial Code).

priate to look to state commercial law for guidance since Congress intended to employ language already in use in state commercial law when it included leases in the section 1602(g) definition of credit sale. *See* H.R. Rep.No. 1040, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Ad.News 1962, 1980; *see also Waldron v. Best T.V. and Stereo Rentals, Inc.*, 485 F.Supp. 718 (D.Md.1979); *Jones v. Action T.V. Rental, Inc.*, Civil Action No. 79–1535, slip op. at 8.

The relevant Pennsylvania statute, 12A Pa.Cons.Stat.Ann. § 1–201(37) (Purdon 1970) (repealed) provides in part:

> Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.[7]

From this section, it is apparent that in distinguishing between a lease and a conditional sale, it can be highly significant that a lessee is granted an option to purchase for nominal consideration. Applying this section, one court found a rental agreement to be a conditional sales contract rather than a lease even though the agreement contained an option to terminate. The lessee had an option to purchase for little or no additional consideration and the rentals were credited towards the purchase price. *United Rental Equipment Co. v. Potts & Callahan Contracting Co.*, 231 Md. 552, 191 A.2d 570, 574 (1963) (applying Pennsylvania law). *See*

*also In re Royer's Bakery, Inc.*, 1 UCC Rep. Serv. 342 (E.D.Pa.1963); *In re Dennis Mitchell Industries, Inc.*, 4 UCC Rep.Serv. 1082 (E.D.Pa.1967) (terminable lease intended as security interest).

In this case, plaintiff had the right to purchase the premises for the nominal consideration of $1.00 at the end of the lease, if the successive monthly rental payments were made for ten years. These rental payments were effectively credited towards the eventual purchase price. Thus, plaintiff acquired an equity interest as the payments were made. Also significant under section 1602(g) is the fact that the rental fees of $150.00 a month for ten years total $18,000, an amount far in excess of the property's fair market value of approximately $2,000.00.

Under these circumstances, the mere fact that the lessee had an option to terminate the lease does not preclude a finding that the agreement was a credit sale rather than a lease.[8]

Moreover, the incidents of ownership shifted to the lessee under the agreement. The plaintiff was obligated to pay all taxes, water and sewer rents, insurance and to make all repairs at her expense.[9] In effect, all the burdens and risks of ownership were shifted immediately to plaintiff, by the lease agreement, providing further evidence that the parties intended the transaction to be a sale, rather than a lease.

Therefore, I hold that the agreement entered into between plaintiff and defendants constituted a credit sale within the meaning of section 1602(g) of the Act, and that defendants were required to make the disclosures specified under the Act.

---

**7.** This section was in effect at the time the parties entered the agreement. It has subsequently been repealed and replaced by 13 Pa. Cons.Stat.Ann. § 1201 (Purdon Supp. 1980), which contains language identical to the provision set forth above.

**8.** In any event, the purchase option was a type written provision which would take precedence over the boiler plate termination provisions of the pre-printed lease, to the extent there is any inconsistency between a termination provision and an option to purchase. *See, e.g., Cusama-*

*no v. Anthony M. DiLucia, Inc.*, 281 Pa.Super.Ct. 8, 421 A.2d 1120, 1124 (1980).

**9.** An argument can be made that the agreement would be illegal under Pennsylvania law if interpreted as a lease. Pennsylvania law governing real estate leases provides that a non-waivable implied warranty of habitability is present in all residential leases. *Fair v. Negley*, 257 Pa.Super.Ct. 50, 390 A.2d 240 (1978). Thus, arguably a lessor could not shift the burden and responsibility for repairs and maintenance to the tenant.

Since defendants admittedly failed to provide plaintiff with the required disclosures, plaintiff is entitled, as a matter of law, to statutory damages equal to twice the amount of the finance charge imposed (with a minimum amount of $100.00 and a maximum amount of $1,000.00), plus costs and reasonable attorney's fees. 15 U.S.C. § 1640(a).

For purposes of determining the amount of statutory damages in cases such as this where no finance charge is disclosed, courts look to the difference between the market value of the property sold and the price charged over time. *Killings v. Jeff's Motors, Inc.*, 490 F.2d 865, 866 (5th Cir. 1974). *See also Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 366 n.26, 93 S.Ct. 1652, 1659 n.26, 36 L.Ed.2d 318.

The total payments in this case would have amounted to $18,000. The plaintiffs have submitted an appraisal of the property which estimates its fair market value to be $2,000. The difference between the two figures is in excess of $500.00, so that the maximum civil penalty of $1,000 must be assessed. In addition, Community Legal Services, as plaintiff's counsel, is entitled to reasonable attorney fees, as well as costs. *Johnson v. 2nd National Fund Corp.*, 515 F.Supp. 1380 (E.D.Pa.1981).

### Conclusion

For the reasons set forth above, plaintiff's Motion for Summary Judgment is granted and plaintiff is entitled to damages in the amount of $1,000, plus costs and reasonable counsel fees.